The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Fuleihan and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, with the exception of some modifications due to the length of the Deputy's decision, and a modification with regard to a credit issue addressed in Conclusion of Law four.
* * * * * * * * * * *
Plaintiff made an oral motion during argument for attorney's fees pursuant to N.C.G.S. 97-88.1. In that defendant's actions were not based upon stubborn, unfounded litigiousness, plaintiff's motion for attorney's fees pursuant to N.C.G.S. 97-88.1 is hereby DENIED. Sparks v. MountainBreeze Restaurant Fish House, Inc., 55 N.C. App. 663,286 S.E.2d 575 (1982).
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. On the date of the injury by accident giving rise to this claim, June 9, 1991, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employer-employee relationship existed between plaintiff and defendant-employer.
3. At such time, the defendant-employer was a qualified self-insurer, with Alexsis, Inc. acting as third-party administrator.
4. Plaintiff's average weekly wage, as determined from the Form 22 submitted by defendant, was $533.77, yielding a compensation rate of $355.85 per week.
5. No Form 21 agreement was filed in this case, but defendant paid plaintiff $338.21 a week for the period from June 17, 1991 through July 20, 1993.
6. Plaintiff sustained an injury by accident arising out of and in the course of his employment on June 9, 1991.
7. The parties have stipulated to medical and related records contained in a set of Stipulated Medical Records with page numbers 1-300, and such records were received into evidence.
8. The parties further stipulated that all I.C. forms, motions, pleadings, discovery requests and responses would be made a part of the record in this case, and the parties have submitted a notebook containing certain stipulated pleadings, with the pleadings numbered 1-35, and such documents were received into evidence.
9. On the day of the original hearing in this case, the parties could not complete the presentation of lay testimony. Pursuant to consent of the parties, the parties then submitted the following lay testimony in the form described: (a) Deposition of Philip E. Bell; (b) Deposition of Donnie Richardson; (c) Affidavit of Bonnie Haynmore; (d) Affidavit of David Ross; (e) Affidavit of Lee Cobbler; (f) Affidavit of Jess Workman; (g) Affidavit of Linda C. Jamison.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner, with modifications, as follows:
FINDINGS OF FACT
1. At the time of the original hearing in this matter, plaintiff was 32 years old. Plaintiff graduated from high school in Surry County and thereafter received training as an emergency medical technician (EMT) at Catawba Community College.
2. Plaintiff's employment history included positions as a private investigator, an auto parts clerk, a machine operator at a manufacturing facility, and a dispatcher and EMT for Yadkin County and Surry County.
3. During his employment with Surry County as an EMT, plaintiff obtained a certificate as an IV Technician ("IV Tech"), the next level of training for emergency medical services personnel. Plaintiff later obtained a certificate as a paramedic. In order to maintain certification as an IV Tech or paramedic, an individual must be employed in EMS work. The training is provided through the EMS departments.
4. Plaintiff began his employment with Forsyth County EMS on October 17, 1985. On June 9, 1991, plaintiff was employed as a paramedic by Forsyth County EMS. On that date, plaintiff responded to a call for assistance involving a heart attack patient. The patient was eventually placed in plaintiff's Forsyth County EMS ambulance for transportation to the hospital. Plaintiff was riding in the rear of the ambulance on the way to the hospital when plaintiff noticed that the side door of the ambulance was ajar. As plaintiff moved and reached in the direction of that door, plaintiff fell from the moving ambulance and fell into a lawn adjacent to the road, rolling and striking his head, back, and other parts of his body. Plaintiff was attended to while another ambulance was called to the scene.
5. Prior to his arrival in the emergency room, plaintiff suffered two brief seizure-like episodes, each lasting no more than ten to fifteen seconds. Plaintiff was unconscious for no more than a few minutes, and was awake and alert by the time he reached the emergency room. Once at the emergency room, plaintiff responded appropriately to questions.
6. Upon admission to the emergency room at Forsyth County Memorial Hospital, plaintiff was seen and examined by Dr. Lew Stringer. Dr. Stringer admitted plaintiff to the hospital overnight as a precaution, and administered certain tests, including x-rays and a CAT scan. Dr. Stringer also conducted a neurological examination of plaintiff, and found no neurologic deficits. Plaintiff's CAT scan was normal, and the x-rays only revealed a possible fracture of the transverse process. Such a transverse process fracture requires no special treatment and is not disabling.
7. On June 11, 1991, Dr. Stringer discharged plaintiff from the hospital and referred him to Dr. Baldwin Smith, a neurologist. Plaintiff saw Dr. Smith on June 12, 1991. Dr. Smith ordered that plaintiff undergo a waking and sleeping EEG. Both of these tests were normal, and Dr. Smith also reviewed the CAT scan of plaintiff's head which had been taken on June 9, 1991. Dr. Smith saw no abnormalities. Dr. Smith was not sure whether plaintiff had suffered a seizure or not, but found no abnormalities that would require seizure modification, further treatment, or driving restrictions.
8. On June 21, 1991, plaintiff returned to Dr. Stringer for a follow-up visit. At that time, Dr. Stringer released plaintiff to return to work. Plaintiff thereafter returned to work and worked several shifts in his position as a paramedic. During one of his shifts, plaintiff was lifting a bag of equipment, weighing approximately forty pounds, and felt the onset of severe pain in his lower back. No claim for Workers' Compensation benefits was filed concerning this incident. Plaintiff returned to Dr. Stringer on July 8, 1991, complaining of further problems with his back, and Dr. Stringer referred plaintiff to Dr. Bostic for orthopaedic evaluation.
9. Plaintiff was first seen by Dr. William Bostic on July 11, 1991, and Dr. Bostic diagnosed him as having suffered a sprain and contusion of the cervical, thoracic, and lumbar spine. Dr. Bostic prescribed conservative care, including the use of a brace and physical therapy. Plaintiff commenced physical therapy at the Martinat Outpatient Rehabilitation Center on July 25, 1991, and continued in physical therapy there for several months. During this time, plaintiff missed several appointments because of medical problems caused by a spider bite, and he also canceled several appointments, reporting "multiple problems at home."
10. On September 5, 1991, plaintiff was seen by Dr. Jesse E. Roberts, a physician at the Martinat Outpatient Rehabilitation Center. Plaintiff described his back symptoms to Dr. Roberts, and Dr. Roberts felt that plaintiff might have an acute lumbar sprain/strain syndrome with a suggestion of radiculopathy. Dr. Robert's evaluation of the x-rays of plaintiff's back taken after the accident, was that they did not clearly reveal a fracture of the transverse process. Plaintiff complained to Dr. Roberts of memory problems, and Dr. Roberts referred plaintiff to Dr. Kevin Wilson for psychometric testing to determine whether plaintiff had suffered a closed head or brain injury. Dr. Roberts also referred plaintiff back to Dr. Smith for further evaluation.
11. Dr. Kevin Wilson, a psychologist, saw plaintiff for the first time on September 17, 1991. Plaintiff underwent psychological evaluation and testing at that time. Dr. Wilson procured a copy of plaintiff's high school transcript, which revealed that plaintiff finished school with a class rank of 141 out of 160. Dr. Wilson administered I.Q. and MMPI tests. Plaintiff tests resulted in a verbal I.Q. of 77, a performance I.Q. of 69, and a Full Scale I.Q. of 72. The MMPI tests showed extreme over-reporting of psychological systems, with the score being just one point below the level at which the test is considered invalid. In other testing, plaintiff showed a very low frustration level. Based on the assumption that a person with such scores could not do EMT work, Dr. Wilson concluded that plaintiff had cognitive deficits as a result of his head injury. Dr. Wilson recommended repeat testing and psychotherapy.
12. In December, 1991, plaintiff complained to Dr. Roberts of increased pain in his right lower back. A subsequent MRI showed a possible herniated disc at the L5-S1 level. Dr. Roberts referred plaintiff to Dr. Ernesto de la Torre for further evaluation. Dr. de la Torre evaluated plaintiff and found the CAT scan of plaintiff's head to be normal, the x-rays to show no transverse process fracture, and that plaintiff had a herniated disc that should be treated surgically. Plaintiff's major disc problem began in December of 1991, with possible early symptoms manifesting themselves in the summer of 1991. There is no indication of any disc injury prior to August 1991.
13. Prior to the surgery, plaintiff had an EEG and an MRI of the brain. The results of these tests were normal. Plaintiff's surgery went well, and he was released from the hospital on January 26, 1992.
14. There is insufficient medical evidence of record from which to prove by its greater weight that plaintiff's herniated disc at the L5-S1 level was caused by the June 9, 1991 injury by accident.
15. Plaintiff continued to complain of back pain and was readmitted for another procedure in June, 1992. Only scar tissue was found during this procedure and plaintiff was discharged on June 21, 1992.
16. In July, 1992, plaintiff applied for disability retirement. Dr. de la Torre supported plaintiff in this effort based on Dr. de la Torre's belief that plaintiff's I.Q. scores would not permit him to work as an EMT. Dr. de la Torre explained to plaintiff at that time that his disability was not due to any back problems, and that the back disability would be temporary. As of August 1, 1992, plaintiff began receiving monthly disability benefits of $919.00.
17. Dr. de la Torre last treated plaintiff on August 6, 1992. Dr. de la Torre noted that plaintiff was much improved and he encouraged plaintiff to stay active and increase his activities. Other than a single visit to get a rating in April of 1993, plaintiff has not sought any care or made any complaints about his back since August of 1992.
18. Plaintiff sought psychiatric treatment in October 1992 due to marital problems. Plaintiff was eventually admitted to Charter Hospital and Forsyth Memorial Hospital due to these problems. Plaintiff had previously undergone psychiatric care in 1989, having been referred to Dr. Ali Jarrahi by his family physician, Dr. Thomas Littlejohn, III. Plaintiff told Dr. Jarrahi at that time that he had a recent history of severe headaches, and that there were no medical findings to account for them. Plaintiff also reported recent crying spells, irritability, and poor concentration to Dr. Jarrahi. Plaintiff was placed on psychiatric medication by Dr. Jarrahi, and remained on this medication and under Dr. Jarrahi's care through at least August 27, 1990. There is insufficient evidence of record from which to prove by its greater weight that plaintiff's psychiatric problems, which preexisted the compensable injury, were causally related to the June 9, 1991 injury by accident.
19. On April 16, 1993, plaintiff had reached maximum medical improvement and was given a 20% permanent partial disability rating to his back by Dr. Rawlings, a partner of Dr. de la Torre. This rating was based on the herniated disc and two surgical procedures which were unrelated to the June 9, 1991 injury.
20. By May 10, 1993, plaintiff had begun full-time work in Apples' Small Engine Repair Shop, a business located in Kernersville, North Carolina. Plaintiff's duties included operating a computer, answering a telephone, dealing with customers, looking up parts on a microfilm machine, and selling parts over the counter. Plaintiff earned approximately $500 to $600 in June of 1993. He left this job because an investigator hired by defendant had reported that plaintiff was working.
21. Plaintiff worked numerous weekends in 1993 on the pit crews of various NASCAR teams. Plaintiff's position was "catch can man." As a "catch can man," plaintiff's duties included jumping over the wall during pit stops and holding a small can at the rear of the car during fueling to catch any overflowing gasoline. Plaintiff also, on occasion, assisted the crew member who handles the large gas can that fills the car. Plaintiff, while holding the small overflow can with one hand or propped against his leg, sometimes leaned over and held the can, or threw the large, empty can back over the wall when it was empty. Furthermore, plaintiff completed other miscellaneous tasks as a crew member. Plaintiff helped to set up the pit stall and keep it clean, which entailed picking up objects such as the jack, as well as sweeping. On occasion, such as after the car was in a racing accident, plaintiff helped to get the car back in the race as quickly as possible, doing such things as changing tires.
22. After stopping work at Apple's Small Engine Repairs, plaintiff made no further effort to obtain full time-employment. Plaintiff has not shown that he was unable for any reason to seek out or obtain employment. To the contrary, every effort plaintiff made at obtaining employment (at Apple's and with the NASCAR race teams) was successful.
23. Defendant terminated payment of compensation to plaintiff on May 10, 1993. Although defendant did not obtain permission to stop the payment of benefits, no Form 21 had been filed. Therefore, the Commission could not have ruled on any Form 24 submitted. However, under Industrial Commission standards for accepted cases, plaintiff's temporary total disability had ended before defendant stopped weekly benefit payments, and if there had been a Form 21 filed, defendant would have been entitled to an order allowing it to stop payment of benefits. Plaintiff was not prejudiced by defendant's failure to obtain approval of the Industrial Commission to stop payments in June, 1993.
24. In July, 1993, plaintiff moved to Dobson, North Carolina in Surry County. At that time, plaintiff also became an active member of the Dobson Rescue Squad. Although this is a volunteer organization, all members are required to maintain active, continuing EMT training. The Dobson Rescue Squad operates exactly like a paid unit in responding to calls and in every other respect, and is dispatched by the same center that dispatches all emergency calls in the area.
25. In Spring, 1994, plaintiff became the captain of the Dobson Rescue Squad, and continued to serve in that capacity at the time of the original hearing in this matter.
26. Plaintiff's activities as a member and officer of the Dobson Rescue Squad have been extensive. Plaintiff has responded to more emergency calls than any other member of the Dobson Rescue Squad. During a six month period in the beginning of 1994, plaintiff responded to approximately 140 emergency calls. Plaintiff responded to virtually all of the calls for the Dobson Rescue Squad with the exception of the ones on weekends, when he was out of town on his NASCAR job. Since July, 1993, plaintiff, in connection with his duties as a member and officer of the Dobson Rescue squad, has regularly and continuously been engaging in such activities as: driving emergency vehicles (even driving emergency vehicles for the Surry County EMS when called upon to do so by the paid employees when they needed the assistance), providing treatment to injured victims, extricating trapped victims of automobile accidents, lifting and moving patients, and operating machinery known as the "jaws of life." Plaintiff has participated in these activities without apparent physical or mental limitation.
27. Plaintiff was employed by the King Racing Team for the 1994 season, and performed as the "catch can man" for all 26 NASCAR races that year.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On June 9, 1991, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer when he fell out of a moving ambulance while on an emergency call. N.C.G.S. 97-2(6).
2. As a result of the compensable injury, plaintiff was temporarily totally disabled and entitled to receive temporary total disability compensation at the rate of $355.38 from June 10, 1991 through May 10, 1993. N.C.G.S. 97-29. Defendant has already paid plaintiff for 113 weeks of temporary total disability at the rate of $338.21 per week, which has resulted in an overpayment of compensation despite the discrepancy in the compensation rates. Defendant is entitled to a credit for this overpayment. N.C.G.S. 97-42.
3. Plaintiff regained the capacity to earn the same wages he was earning at the time of his compensable injury on May 10, 1993, the date by which plaintiff had begun working full-time in Apple's Small Engine Repair Shop in Kernersville, North Carolina. By that date plaintiff also had reached maximum medical improvement as to his injuries from the June 9, 1991 accident. Therefore, plaintiff is not entitled to any further temporary total disability compensation after May 10, 1993. N.C.G.S. 97-2(9); 97-29.
4. Plaintiff sustained a permanent partial disability as a result of a closed head injury suffered in the June 9, 1991 accident. Plaintiff is entitled to an award of $7,000 for this injury. N.C.G.S.97-31(24). Defendant is entitled to a credit for overpayment of temporary total disability benefits. Defendant is not, however, entitled to a credit for State Disability Retirement benefits received by plaintiff pursuant to N.C.G.S. 97-42, in that Defendant had accepted the claim and the disability was due and payable, and this was not an employer-funded salary continuation as contemplated by the statute. See Moretz v. Richards, 316 N.C. 539, 342 S.E.2d 844
(1986).
5. Plaintiff is entitled to payment by defendant-employer of all medical expenses incurred or to be incurred as a result of this injury. N.C.G.S. 97-2(19); 97-25. However, plaintiff is not entitled to medical compensation for in-patient psychiatric treatment received in October 1992 or April 1993, or the treatment or counseling received from Doctors Phan, McColloch or Bahrani.
6. Plaintiff's herniated disc at the L5-S1 level is not causally related to the June 9, 1991 injury. Plaintiff is not entitled to further compensation for his back condition.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner, and enters the following:
AWARD
1. Plaintiff is entitled to any temporary total or permanent partial disability compensation previously unpaid by defendant due to defendant's reliance on the previous Opinion and Award's interpretation of the credit issue.
2. Defendant shall pay all medical expenses incurred or to be incurred as a result of this injury. N.C.G.S. 97-2(19); 97-25. However, plaintiff is not entitled to medical compensation for in-patient psychiatric treatment received in October 1992 or April 1993, or the treatment or counseling received from Doctors Phan, McColloch, or Bahrani.
3. A reasonable attorney's fee in the amount of 25% of the compensation benefits due under paragraph one of this Award is hereby approved for plaintiff's counsel.
4. Defendant shall pay the costs due this Commission.
 S/ _______________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ ______________________________ DIANNE C. SELLERS COMMISSIONER
S/ ______________________________ BERNADINE S. BALLANCE COMMISSIONER